8 F.3d 26
 62 USLW 2219
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
ESTATE OF Marilyn Marie CONNERS, by its administrator,
Howard Meredith; Howard Meredith; Lillian
Beatty, individuals, as sole heirs of
Marilyn Marie Conners,
Plaintiffs-
Appellees,
Cross-Appellants,
v.
Dennis M. O'CONNOR; Thaddeus Kostrubala,
Defendants-Appellants, Cross-Appellees.
 Nos. 92-15241, 92-16414, 92-16775, 92-16917.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 11, 1992.
Decided Oct. 4, 1993.
 
 1
 Before: BROWNING and CANBY, Circuit Judges, and KELLEHER,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 This civil rights action under 42 U.S.C. § 1983 arises from the death of a patient at Napa State Hospital ("NSH"), a California mental institution. Dr. Dennis Michael O'Connor, the former Executive Director of NSH, and Dr. Thaddeus Kostrubala, the Medical Director of NSH, appeal the jury verdict against them. The consolidated cross-appeals challenge the district court's award of attorney's fees to the plaintiffs. We affirm in part and reverse in part.
 
 FACTS & PROCEDURAL BACKGROUND
 
 4
 In 1979, John Duncan was committed to NSH pursuant to Cal.Penal Code § 1026, after having pleaded not guilty by reason of insanity to a murder charge. In 1982, Marilyn Marie Conners was civilly committed to NSH after suffering injuries in an automobile accident that left her mentally disabled. In April 1985, on the grounds of NSH, Duncan raped and murdered Conners.
 
 
 5
 In 1986, Conners's parents and the administrator of her estate brought this section 1983 action against four doctors and administrators at NSH. In a prior interlocutory appeal, this court affirmed the district court's denial of the defendants' motion for summary judgment based on qualified immunity. Estate of Conners v. O'Connor, 846 F.2d 1205 (9th Cir.1988), cert. denied, 489 U.S. 1065 (1989). In September 1991, the case went to trial. The district court denied the defendants' motions for a directed verdict, and the jury returned a verdict of $280,785 against Drs. O'Connor and Kostrubala. These defendants moved for judgment notwithstanding the verdict ("JNOV") or, in the alternative, for a new trial. The district court denied the motion, and Drs. O'Connor and Kostrubala appealed. Both sides appealed from the district court's award of attorney's fees to the plaintiffs.
 
 ANALYSIS
 I. Motion for JNOV
 
 6
 Drs. O'Connor and Kostrubala contend that the jury verdict against them is not supported by substantial evidence and, therefore, that the district court erred by denying their motion for JNOV. We review de novo the denial of a motion for JNOV. Erickson v. Pierce County, 960 F.2d 801, 804 (9th Cir.), cert. denied, 113 S.Ct. 815 (1992). Without considering the credibility of the witnesses or weighing the evidence, we must determine whether the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can reasonably support a judgment in favor of the nonmoving party. The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1151 (9th Cir.1988) (citations omitted). We may not substitute our judgment for that of the jury, but rather must determine whether the verdict is supported by substantial evidence. Id. A patient committed to a state mental institution has a constitutionally protected liberty interest in personal security and reasonably safe conditions of confinement. Youngberg v. Romeo, 457 U.S. 307, 324 (1982). In a section 1983 action against officials of such an institution:
 
 
 7
 [A] decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.
 
 
 8
 Id. at 323 (footnote omitted).
 
 A. Case Against Dr. Kostrubala
 
 9
 The case against Dr. Kostrubala focused primarily on Duncan's receipt in March 1985 of a "P-card," which conferred on him the privilege of moving about the grounds. Duncan committed the murder while out on the grounds pursuant to this P-card. Dr. Kostrubala argues that there was insufficient evidence to establish that he participated in the decision to grant grounds privileges to Duncan, and that therefore he did not fail to exercise professional judgment. We reject this argument.
 
 
 10
 The evidence at trial demonstrated that on December 13, 1984, Duncan's P-card was revoked for ninety days because he was found "to be out of bounds with a female visitor." After this ninety-day period, Duncan's P-card was reissued. A written policy at NSH required that, before a revoked P-card was reissued, the patient had to be evaluated by his treatment team, and reissuance of the card had to be approved by the program director. Duncan's file, however, contained no record of any such assessment prior to the reissuance of his P-card on March 13, 1985. The plaintiffs' theory at trial was that the reissuance of Duncan's P-card without, at a minimum, compliance with the NSH policy, represented gross negligence and a substantial departure from accepted professional judgment. The plaintiffs presented substantial evidence that Kostrubala had the ultimate responsibility for the issuance of P-cards to penal code patients, and that Kostrubala was familiar with Duncan and his propensity for violence. The plaintiffs also presented evidence that, approximately two weeks before Conners's death, Kostrubala told the executive director of NSH that he was surprised that Duncan had a P-card; Kostrubala further stated that he intended to "pull" the card. Moreover, the plaintiffs provided expert testimony that supported their claim that Dr. Kostrubala's failure to prevent the reissuance of Duncan's P-card in March 1985 constituted such a substantial departure from accepted professional judgment that it was not based on professional judgment. This evidence and its inferences, viewed in the light most favorable to the plaintiffs, reasonably supports the verdict against Kostrubala. Accordingly, we conclude that the district court did not err by denying his motion for JNOV. See The Jeanery, 849 F.2d at 1151.[1]
 
 B. Case Against Dr. O'Connor
 
 11
 Dr. O'Connor was the Executive Director of NSH from October 1977 until October 1983, when he became the Director of the California Department of Mental Health. The plaintiffs' case against O'Connor was based on his failure in 1982-1983 to transfer Duncan from NSH to Atascadero State Hospital ("Atascadero"), a higher-security institution. Dr. O'Connor argues that his conduct was not the proximate cause of Conners's death. We agree.
 
 
 12
 Under section 1983, " '[a] supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.' " Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.1991) (en banc) (quoting Hansen v. Black, 885 F.2d 642, 646 (9th Cir.1989)) (emphasis added in Redman ), cert. denied, 112 S.Ct. 972 (1992). " 'The requisite causal connection can be established ... by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.' " Redman, 942 F.2d at 1447 (quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978)). Even if the defendant's conduct is an actual or a "but for" cause of the plaintiff's injury, however, the question remains whether the defendant's conduct is the legal or proximate cause. White v. Roper, 901 F.2d 1501, 1505-06 (9th Cir.1990) (citing W. Prosser & W. Keeton, The Law of Torts, § 42, at 272-73 (5th ed. 1984)). Whether an intervening cause supersedes the defendant's liability depends upon what was reasonably foreseeable to the defendant when he committed the challenged conduct. Id. at 1506 (citing Prosser & Keeton, supra, § 44, at 303-04).
 
 
 13
 On December 11, 1982, after Duncan had violated hospital rules prohibiting patients from possessing contraband, Dr. O'Connor determined that Duncan was a security risk and had to be transferred to Atascadero. Before the transfer could be accomplished, however, Duncan's mother filed a petition for a writ of habeas corpus in state court and obtained a temporary automatic stay of the transfer. On March 17, 1983, Duncan's attorney wrote a letter to the court stating that: "I have been informed by Max Cox of Napa State Hospital that they do not intend to pursue the matter of transferring Mr. Duncan to Atascadero State Hospital, and am therefore having the hearing dropped from the calendar." At trial, Dr. O'Connor testified that he could not remember why he had not pursued his attempt to transfer Duncan to Atascadero, nor could he remember why the state court hearing had been cancelled.
 
 
 14
 Our review of the record reveals that the evidence does not support the jury's determination that O'Connor's failure to transfer Duncan to Atascadero in 1983 was the proximate cause of Conners's death. The aborted attempt to transfer Duncan occurred more than two years before the murder. More important, Duncan first received grounds privileges in November 1983, after Dr. O'Connor had left NSH. Without a P-card, Duncan could not have wandered the NSH grounds unsupervised; the reissuance of Duncan's P-card in March 1985 thus was the immediate cause of the murder. Moreover, much of the plaintiffs' case was devoted to demonstrating that, in light of Duncan's numerous violations of hospital rules and his propensity for violence, the grant of grounds privileges to him represented a complete absence of professional judgment by the NSH staff. Viewing the evidence in the light most favorable to the plaintiffs, we conclude that it was not reasonably foreseeable to Dr. O'Connor in March 1983 that Duncan later would obtain grounds privileges and murder another patient. Because the grant of grounds privileges to Duncan in March 1985 was an intervening cause of Conners's death that was not reasonably foreseeable to O'Connor, it frees him of liability for the deprivation of Conners's constitutional rights. See Redman, 942 F.2d at 1447; White, 901 F.2d at 1505-06. Accordingly, the district court erred by denying O'Connor's motion for JNOV, and we reverse the judgment against him. See The Jeanery, 849 F.2d at 1151.[2]
 
 II. Motion for a New Trial
 
 15
 Dr. Kostrubala asserts that the district court abused its discretion by denying his motion for a new trial. He argues that he was denied a fair trial because plaintiffs' counsel used improper tactics that were designed to inflame the jury. In particular, he complains that plaintiffs' counsel (1) repeatedly referred to murder and rape, (2) insinuated that the defendants were involved in a conspiracy to prevent Duncan from being transferred to Atascadero, and (3) improperly appealed to the jury's sympathy during closing argument. We reject these arguments.
 
 
 16
 We review for an abuse of discretion the district court's denial of a motion for a new trial. McKinley v. City of Eloy, 705 F.2d 1110, 1117 (9th Cir.1983). "To warrant reversal on grounds of attorney misconduct, the flavor of the misconduct 'must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.' " Id. (quoting Standard Oil Co. v. Perkins, 347 F.2d 379, 388 (9th Cir.1965)). Kostrubala has not demonstrated that any misconduct by plaintiffs' counsel so permeated the trial that it prevented the jury from fairly considering the evidence. Accordingly, we find that the district court did not abuse its discretion by denying the motion for a new trial. See id.[3]
 
 III. Jury Instructions
 
 17
 Kostrubala next contends that the district court erroneously instructed the jury on the standard of liability. He objects to the instructions' reference to "deliberate indifference," and argues that the Supreme Court rejected a deliberate indifference standard in Youngberg. We find no error.
 
 
 18
 We review the jury instructions to " 'determine whether, viewing the instructions as a whole, the court gave adequate instructions on each element of the case to ensure that the jury fully understood the issues,' and to determine 'whether the instruction is misleading or states the law incorrectly to the prejudice of the objecting party.' " Martinelli v. City of Beaumont, 820 F.2d 1491, 1493 (9th Cir.1987) (quoting Kisor v. Johns-Manville Corp., 783 F.2d 1337, 1340 (9th Cir.1986)).
 
 
 19
 Here, the district court instructed the jury that the plaintiffs had to prove:
 
 
 20
 First, that one or more of the defendants acted or failed to act with deliberate indifference to Marilyn Conners' safety such that defendants' acts or omissions constituted such a substantial departure from accepted professional judgment, practice or standards, such that you conclude that no professional judgment was, in fact, exercised;
 
 
 21
 * * *
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 The decisions, if any, made by a defendant with respect to the supervision, care, or treatment of either Duncan or Ms. Conners are presumed to have been valid. This presumption of validity can only be overcome if you find that a decision made by a defendant which proximately caused the harm was a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the defendant did not base his act or omission on such a judgment.
 
 
 25
 Reporter's Transcript, October 11, 1991, at 35-36.
 
 
 26
 The language of the challenged instruction was drawn from this court's opinion in the defendants' prior appeal, in which we held that:
 
 
 27
 Liability may be imposed on a professional state officer only when his or her decision is so objectively unreasonable as to demonstrate that he or she actually did not base the challenged decision upon professional judgment. See Youngberg, 457 U.S. at 323. We believe that this standard is equivalent to that required in ordinary tort cases for a finding of conscious indifference amounting to gross negligence.
 
 
 28
 Estate of Conners, 846 F.2d at 1208. Because the language of the district court's instructions tracks this precedent, we conclude that, viewed as a whole, the instructions adequately explained the standard of liability and accurately stated the law. See id.; Martinelli, 820 F.2d at 1493.
 
 
 29
 IV. Defendants' Appeal from Award of Attorneys' Fees
 
 
 30
 A. Hourly Rate Awarded by the District Court
 
 
 31
 The defendants argue that the district court erred by awarding plaintiffs' attorneys hourly rates that exceeded their customary billing rates. We disagree.
 
 
 32
 "Reasonable fees under § 1988 are calculated according to the prevailing market rates in the relevant legal community, and the general rule is that the rates of attorneys practicing in the forum district ... are used." Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th Cir.1993) (citations omitted). Billing rates "should be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity." Davis v. City and County of San Francisco, 976 F.2d 1536, 1545 (9th Cir.1992). Evidence of the attorney's customary billing rate may be considered, but the district court does not abuse its discretion if it chooses instead to apply a reasonable community standard. White v. City of Richmond, 713 F.2d 458, 461 (9th Cir.1983).
 
 
 33
 The evidence before the district court established that plaintiffs' attorneys John Scott and Robert Brown customarily charge their clients $200 per hour. In this case, however, they were seeking hourly rates of $250 and $285 respectively. The district court also considered declarations from several attorneys practicing in San Francisco who stated that the requested hourly rates were within the range of prevailing market rates for attorneys of similar skill and experience. Given this evidence, the district court decided to reduce the requested hourly rates and award $225 per hour for Scott and $250 per hour for Brown. Because the district court considered the proper factors and calculated a reasonable rate "according to the prevailing market rates in the relevant legal community," we find no abuse of discretion. See Gates, 987 F.2d at 1405; Davis, 976 F.2d at 1545.
 
 
 34
 B. Number of Hours Expended by Plaintiffs' Counsel
 
 
 35
 The defendants argue that plaintiffs' counsel were compensated for an unreasonable number of hours. In particular, they argue that counsel should not have been compensated for hours spent conducting unnecessary discovery, interviewing and deposing witnesses who did not testify at trial, and preparing for an unsuccessful arbitration. These arguments fail.
 
 
 36
 The district court reduced the fee request by denying compensation for (1) hours claimed for "telephone conferences" and "attorney meetings", the purposes of which were not adequately documented; (2) hours spent on state court proceedings; and (3) hours that were duplicative. Because the record demonstrates that the district court carefully and critically evaluated the fee request, we find no abuse of discretion. See Gates, 987 F.2d at 1398-99 (district court must evaluate critically the fee request and articulate reasons for its findings regarding the propriety of the hours claimed).
 
 C. Contingent Fee Agreement
 
 37
 The defendants argue that the fee award of $315,433.94 is excessive in light of the contingent fee agreement, under which plaintiffs' counsel would have received only $112,400. This argument lacks merit. The Supreme Court has held that a contingency-fee agreement does not serve as a cap on the fee award under 42 U.S.C. § 1988. Blanchard v. Bergeron, 489 U.S. 87, 94-95 (1989). Instead, such an agreement is simply a factor that the district court may consider in setting a reasonable fee award. Id. at 92-93.
 
 
 38
 Here, the district court acted within its discretion because it considered the contingent-fee agreement, but decided that a larger fee award was warranted. We find that the district court's fee award is reasonable. See id.; Quesada v. Thomason, 850 F.2d 537, 543 (9th Cir.1988) (among other reasons for rejecting a private fee agreement as a cap on a fee award under section 1988, defendants "should not benefit from the private agreement by being permitted to pay anything less than a reasonable hourly wage").
 
 D. Limited Success at Trial
 
 39
 Finally, the defendants assert that the fee award is excessive because the plaintiffs were only partially successful at trial. We reject this argument.
 
 
 40
 The Supreme Court has stated that " 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.' " Farrar v. Hobby, 113 S.Ct. 566, 574 (1992) (quoting Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)). In Farrar, the plaintiffs had received $1 in nominal damages in a section 1983 action in which they had sought $17 million. Id. Nevertheless, the district court had awarded them over $300,000 in attorney's fees and costs. Id. at 570. The Supreme Court held that the plaintiffs were not entitled to receive a fee award because their success in the action had been so limited. Id. at 574-75.
 
 
 41
 Here, in contrast, the plaintiffs obtained a substantial award of compensatory damages. Moreover, unlike the situation in Farrar, the fee award here is not grossly disproportionate to the damage award. We conclude that, because the plaintiffs' achieved a substantial victory, this case is distinguishable from Farrar, and a reduction in the fee award is not required.
 
 V. Plaintiffs' Cross-Appeal from Fee Award[4]
 
 42
 The plaintiffs argue that the district court abused its discretion by refusing to award fees: (1) for hours attorney Scott worked on the case before he filed a "notice of association of counsel," and (2) for the time the "second-chair" attorney spent at trial. These arguments are not persuasive. Having considered the record, we conclude that it was not unreasonable for the district court to disregard preliminary hours spent by Scott, nor to find "second-chair" hours unnecessarily expended. The overall fee award was "reasonable" within the meaning of section 1988.
 
 CONCLUSION
 
 43
 We affirm the judgment against Dr. Kostrubala, and we affirm the district court's award of attorney's fees to the plaintiffs. We reverse the judgment against Dr. O'Connor.
 
 
 44
 AFFIRMED IN PART; REVERSED IN PART; COSTS AWARDED IN FAVOR OF THE PLAINTIFFS-APPELLEES AGAINST DEFENDANT KOSTRUBALA.[5]
 
 
 
 *
 The Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 Kostrubala also contends that he is entitled to qualified immunity. We disagree. This court previously rejected the defendants' claim of qualified immunity because a genuine issue of material fact existed regarding whether they had violated Conners's clearly established rights to personal security and a reasonably safe environment. Estate of Conners, 846 F.2d at 1208-09 (citing Youngberg, 457 U.S. at 323). At trial, the jury applied the Youngberg standard and found in favor of the plaintiffs. In essence, therefore, Kostrubala's claim of qualified immunity is subsumed by his claim that the jury's verdict is not supported by the evidence. Because we have found that substantial evidence supports the verdict against Kostrubala, he is not entitled to qualified immunity
 
 
 [2]
 Because we find that O'Connor's conduct was not the proximate cause of Conners's death, we need not consider his arguments that he is entitled to absolute or qualified immunity
 
 
 [3]
 Kostrubala also contends that the motion should have been granted because the verdict is against the weight of the evidence. We have reviewed the evidence and determined that it supports the verdict against him. We therefore reject this contention
 
 
 [4]
 We address plaintiffs' challenge to the district court's jurisdiction to reduce the magistrate's fee award in a published opinion, filed simultaneously with this memorandum disposition
 
 
 [5]
 The plaintiffs have requested an award of attorney's fees for these consolidated appeals. Their request should be made to the court pursuant to Ninth Cir.R. 39-1.6