[No. 17170-8-II.   Division Two.   July 12, 1995.]

Judy C. White, *Appellant*, v. The State of Washington, et al., *Respondents*.

*Law Offices of Neil J. Hoff* by *Paul A. Lindenmuth*, for appellant.

*Jeffrey A.O. Friemund, Assistant Attorney General*, for respondents.

FLEISHER, J. — Judy White, an employee at a state nursing home, alleged that she was transferred in retaliation for exercising her First Amendment rights after reporting suspected patient abuse. White also alleged a tort claim for a wrongful transfer in violation of public policy. The trial court dismissed her claims and White appeals. Because reports of suspected patient abuse are matters of public concern and because the State's workplace interests do not outweigh White's interest in reporting the suspected patient abuse, we reverse the trial court and remand in part. Furthermore, because the tort cause of action for a wrongful discharge in violation of public policy does not extend to cover the mere transfer of an employee, we affirm the trial court in part.

## FACTS

Judy White was employed as a secretary at the Washington State Soldier's Home (the Home) in Orting. The Home provides nursing care services to indigent state veterans, who are voluntarily admitted and free to leave at any time. White provided clerical support to several staff members at the Home, including her immediate supervisor, Evelyn Blanchard, the Director of Nursing Services. White also was actively involved in the affairs of her union.

White and Blanchard had a long history of a poor working relationship. Memos were sent back and forth between

the two, criticizing each other's job performance. Furthermore, grievances were filed by White against Blanchard on several occasions.

On April 11, 1988, a patient at the Home became very agitated, scratching himself, smearing feces on himself, and throwing lit cigarettes at other residents. After attempts to calm the patient failed, Blanchard ordered the patient placed in a straitjacket. The parties disagree on the Home's policy regarding the use of straitjackets. The policy either requires that a doctor order the use of a straitjacket, or that emergency use of a straitjacket is permitted so long as a physician's order is obtained as soon as possible. Once the straitjacket was placed on this patient, however, the Home's medical director refused to sign an order permitting its use. The patient was released from the jacket after about two hours.

White observed the patient while he was in the straitjacket. She believed that the use of a straitjacket by the Home was unprecedented. Other employees of the Home were also upset at the use of a straitjacket, and they discussed the incident at their next union meeting. In mid-May 1988, after those employees most familiar with the incident chose not to report their concerns, White, as a union official, decided to report the incident as "patient abuse" to the Home's medical director.

Alan Harrah, the Home's superintendent, arranged to have the incident investigated by outside personnel from another State Soldier's Home located in Retsel. In June 1988, the investigator concluded that no patient abuse had occurred, but noted that "[the] staff who suspected patient abuse were negligent in not reporting the incident immediately."[1]

In December 1987, several months before the straitjacket incident occurred, management at the Home began reorganization discussions. They determined that Blanchard was supervising too many employees. At that time,

---

[1]Clerk's Papers, at 347.

the physical plant at the Home received computer equipment to track the use and maintenance of machinery; before it could be utilized, however, a large volume of information first had to be entered into the system.

In August 1988, after the straitjacket incident, Harrah submitted a reorganization plan to his superiors at the Department of Veteran's Affairs (D.V.A.), that would reassign several departments from Blanchard to the plant manager. The plan also called for a secretary with computer skills to be transferred to the plant manager's office in order to input the initial tracking information. White was one of three available persons in the Home's secretarial pool, and Harrah recommended that she be transferred. This transfer would not result in the loss of any salary or benefits to White.

White soon learned of the proposed transfer and requested a meeting with Harrah. At this meeting, Harrah informed White that the transfer to the physical plant would be effective on November 1, 1988. The plant manager's former office in the physical plant was to be remodeled to serve as White's new office. White stated that she believed that the transfer was partly in retaliation for the accusation of patient abuse. She considered the office to be an undesirable work environment, but refused to provide any suggestions on its remodeling.

In protest, White filed a union grievance on the transfer which Harrah and the director of the D.V.A. denied. White then sought mediation and agreed to a "final resolution" of her grievance that upheld her transfer, but required further modifications to her office at the physical plant. White also submitted a retaliation complaint to the Washington State Human Rights Commission (the Commission) under RCW 70.124.060. The Commission, however, dismissed the complaint because its jurisdiction only extended to discharged employees.[2] White continued work-

---

[2]RCW 70.124.060(1) has since been amended to provide that it is an unfair labor practice to discharge, expel, or otherwise discriminate against a nursing

ing at the Home until June 1992, when she resigned to take a new job.

White filed suit in November 1991, alleging a 42 U.S.C § 1983 cause of action against the individual defendants, Blanchard and Harrah, based on a violation of her free speech rights. She also brought a tort cause of action against both the State and the individual defendants for a wrongful transfer in violation of public policy. The trial court granted the State's motion for summary judgment, dismissing all claims, and White appealed to this court.

## ANALYSIS

### A. The 42 U.S.C. § 1983 Claim

■■ White argues that the trial court erred in dismissing her 42 U.S.C. § 1983 claim against the individual defendants. Under this statute, a person who, under color of law, subjects another to the deprivation of any right under the Constitution is liable to the injured party. 42 U.S.C. § 1983. In these actions, it is well established that a public employee is entitled to reinstatement for a discharge that infringes on the employee's constitutionally protected interest in freedom of speech. *Dicomes v. State*, 113 Wn.2d 612, 624, 782 P.2d 1002 (1989). Furthermore, lesser employment actions, including transfers, are also protected for purposes of First Amendment analysis. *Johnson v. Koppes*, 850 F.2d 594, 595 (9th Cir. 1988). "[A] transfer traceable to speech-related activity is properly the subject of first amendment challenge, even though the transfer result[s] in no loss of pay, seniority, or other benefits." *Allen v. Scribner*, 812 F.2d 426, 434 n.16, 828 F.2d 1445 (9th Cir. 1987) (quoting *Hughes v. Whitmer*, 714 F.2d 1407, 1421 (8th Cir. 1983), *cert. denied*, 465 U.S. 1023 (1984)). In the present case, White was transferred and, therefore, the defendants may be liable if her right to free speech has been violated.

---

home employee for reporting suspected patient abuse. Laws 1993, ch. 510, § 25. Accordingly, if White's complaint arose today, the Commission would probably possess jurisdiction.

■ To determine if a public employer has violated an employee's right to free speech, the court must satisfy a four-step inquiry.[3] *Powell v. Gallentine*, 992 F.2d 1088, 1090 (10th Cir. 1993), *cert. denied*, 115 S. Ct. 2616 (1995); *Binkley v. Tacoma*, 114 Wn.2d 373, 382, 787 P.2d 1366 (1990). First, the public employee must establish that the speech dealt with a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Binkley*, 114 Wn.2d at 382. Second, if the speech dealt with a matter of public concern, the court must balance the interests of the employee as a citizen commenting on matters of public concern with the interests of the State as an employer in providing effective and efficient public service. *Connick*, 461 U.S. at 150; *Binkley*, 114 Wn.2d at 382. Third, the employee must demonstrate that the speech was a substantial or motivating factor in the action taken against the employee. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977); *Binkley*, 114 Wn.2d at 382. Finally, the employer must demonstrate that the same action would have been taken against the employee in the absence of the protected activity. *Mt. Healthy*, 429 U.S. at 287; *Binkley*, 114 Wn.2d at 382. The first two prongs in this four-step process are questions of law for the court to resolve. *Connick*, 461 U.S. at 148 n.7 & 150 n.10; *Binkley*, 114 Wn.2d at 382. Accordingly, the court reviews these determinations *de novo*. The third and fourth prongs, however, are questions of fact ordinarily left to the trier of fact. *Binkley*, 114 Wn.2d at 382; *Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir. 1988).

In the present case, the trial court found that White's comments did not satisfy either the first or the second

---

[3]Many courts collapse the test into three prongs: whether the speech is protected; whether the speech was a substantial or motivating factor in the action taken against the employee; and whether the same action would have been taken against the employee in the absence of the protected activity. *See Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989). The protected speech prong is then composed of two sub-prongs: the public concern test and the interest balancing test. *Delmore*, 886 F.2d at 1197. Thus, regardless of which test is used, courts engage in the same analysis.

prong, and thus did not address the remaining two prongs of the test.

1. Matters of Public Concern

■ Courts have not yet articulated a precise definition of "public concern." *See Allen*, 812 F.2d at 430. Instead, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Courts accordingly do not review the employee's words in a vacuum. *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1577 (5th Cir. 1989), *cert. denied*, 493 U.S. 1019 (1990).

■ In the present case, White reported the placement of a patient in a straitjacket, apparently an unprecedented action at the Home. The content of White's statement, viewed by itself, raises an issue of public concern. Nursing home patients are one of the most vulnerable groups in society. Both the quality of their nursing care and their protection from abuse are clearly matters of public concern. *See Frazier v. King*, 873 F.2d 820, 825 (5th Cir), *cert. denied sub nom. Davoli v. Frazier*, 493 U.S. 977 (1989) (quality of nursing care given to any group is a matter of public concern); *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 593 (10th Cir. 1994) (reports of nursing home patient abuse are matters of public concern). Furthermore, the state Legislature declared the abuse of nursing home patients to be a matter of public concern by adopting a statute requiring the reporting and investigation of patient abuse. RCW 70.124.010 et seq. This statute makes the failure to report suspected abuse a misdemeanor and provides immunity from any liability, civil or criminal, for the good faith reporting of abuse. RCW 70.124.060, .070.

■ The trial court found in this case that the safety of an individual patient is not a matter of public concern in the absence of ongoing policies or conditions that render a danger to other patients similarly situated. However, the

fact that this incident may have been an isolated event does not eliminate the employee's First Amendment protection in light of the clearly established public policy of reporting suspected patient abuse.

■■ The State, however, argues that while patient abuse in general may be a matter of public concern, White's report of suspected abuse did not address a matter of public concern because of the context in which it was made. They contend that White's motive in reporting the suspected abuse was not that of a citizen reporting a matter of public concern, but rather that of an employee involved in a long running dispute with her supervisor. Speech by public employees that addresses individual personnel disputes and grievances, and which would be of no relevance to the public's evaluation of the performance of governmental agencies, is not speech on a matter of public concern. *McKinley v. Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983); *see also Pearson v. Macon-Bibb County Hosp. Auth.*, 952 F.2d 1274, 1278 (11th Cir. 1992) (assignment of emergency room cleaning responsibilities and allocation of blame when cleaning duties neglected not a matter of public concern). However, a topic otherwise of public concern does not lose its importance merely because it arises in the context of an employment dispute. *Ford*, 856 F.2d at 260. In such cases, the court must determine, after eliminating matters of personal interest from the speech, whether the employee's statements can still fairly be considered as relating to matters of concern to the community. *Edwards v. Department of Transp.*, 66 Wn. App. 552, 560-61, 832 P.2d 1332 (1992).

In the present case, while White may have had a self-interest in reporting the straitjacket incident, RCW 70.124.070 requires nursing employees to report incidents of suspected patient abuse. After eliminating any matters of personal interest that White may have had in reporting the incident, there still remains matters of concern to the community in her report. *Edwards*, 66 Wn. App. at 560-61. Accordingly, the trial court erred in finding White's speech was not a matter of public concern.

## 2. Balancing of Interests

■ We next address the second prong of the test, balancing the interests of the employee as a citizen commenting on matters of public concern with the interests of the State as an employer in providing effective and efficient public service. *Connick*, 461 U.S. at 150. Under this balancing test, the *employer* bears the burden of establishing that its interests are greater than those of the employee. *Waters v. Churchill*, 511 U.S. 611, 114 S. Ct. 1878, 1887, 128 L. Ed. 2d 686 (1994); *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995); *but see Binkley*, 114 Wn.2d at 382 (decided earlier and finding that the *employee* has the burden of proof on this issue).[4]

■ In the present case, the trial court found that, even if White's comments were on a matter of public concern, her interests in the speech were not outweighed by the State's interests because of the availability of administrative remedies. However, exhaustion of administrative remedies is not a prerequisite to a section 1983 action. *Patsy v. Board of Regents*, 457 U.S. 496, 516, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982). Thus, while White did use some of the administrative remedies available to her, the existence of other administrative remedies is irrelevant under the balancing of interests test.

■ ■ Under this balancing test, the government has a strong state interest in avoiding interference with work activity, personnel relationships, or disruptions in the

[4]White argues that the Washington Supreme Court in *Binkley* erred in placing this burden on the *employee*. At the time that *Binkley* was decided, it probably stated the correct rule. *See Gillette*, 886 F.2d at 1197. However, more recent federal court decisions concerning section 1983 have placed the burden on the *employer* to establish that its interests in controlling the speech are greater than those of the employee. *See Waters*, 114 S. Ct. at 1887; *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987); *Multnomah County*, 48 F.3d at 422. Therefore, it appears that a shift has occurred in section 1983 analysis since the *Binkley* decision. Because this burden of proof addresses an aspect of First Amendment jurisprudence, the protection provided to citizens for speech on matters of public concern that occupies "the highest rung of the hierarchy of First Amendment values," *Connick*, 461 U.S. at 145, the test identified in these more recent federal cases controls.

public employer's functions. *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899, 97 L. Ed. 2d 315 (1987). The public employer can prevail if it shows that the speech "so severely damaged office harmony and working relationships that the government's interest in promoting an effective workplace outweighs [the employee's] First Amendment rights." *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992), *cert. denied*, 113 S. Ct 2337 (1993). To find the employer's interest in a smoothly running office outweighs an employee's First Amendment rights, the employer must demonstrate actual, material, and substantive disruption. *Roth v. Veteran's Admin. of United States*, 856 F.2d 1401, 1407 (9th Cir. 1988). Any disruption, however, cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views. *McKinley*, 705 F.2d at 1115.

In the present case, it appears that, as a result of their long running feud, White and Blanchard did not function effectively together. The State characterizes White's speech as one in a series of disputes between the parties. However, the State has not demonstrated that White's speech in reporting the suspected patient abuse caused substantial disruption, nor has it demonstrated that the speech damaged office harmony.

The State at oral argument, instead, focused on its interests in implementing the reorganization plan for the Home. The State argued that under White's theory of the case, she could never be transferred once she complained, even when the State's legitimate interests in promoting the efficiency of service require a transfer. The State's position, however, is incorrect. An employee can be reassigned or transferred after reporting suspected patient abuse, but only for legitimate reasons, not in retaliation for her speech. Furthermore, the questions of whether management made its decision in retaliation for White's speech, and whether White would have been transferred regardless of her speech are not considerations under the interest balancing test. The State's argument more

properly addresses the third and fourth prongs of the test, namely, whether the protected speech was a motivating factor in the action taken and whether the same action would have been taken in absence of the protected activity. *Mt. Healthy*, 429 U.S. at 287; *Binkley*, 114 Wn.2d at 382. The trial court did not consider these issues, nor are they before this court.

Because the State has not shown that its interests outweigh the interests of White in reporting the suspected patient abuse, we hold that the trial court erred in dismissing the section 1983 claim.

### B. Qualified Immunity Defense

The State argues that if White engaged in protected speech, Blanchard and Harrah are immune from liability under the defense of qualified immunity. Under this doctrine, state officials cannot be held personally liable for damages in a section 1983 action unless their conduct violated "clearly established" constitutional rights. *Robinson v. Seattle*, 119 Wn.2d 34, 64-65, 830 P.2d 318, *cert. denied*, 113 S. Ct 676 (1992). The question of whether a defendant is entitled to qualified immunity is an issue of law for the court. *Robinson*, 119 Wn.2d at 65. Once the affirmative defense of qualified immunity has been raised in a case on summary judgment, the plaintiff bears the burden of demonstrating the existence of the alleged "clearly established" constitutional right. *Robinson*, 119 Wn.2d at at 65-66.

The court applies the "clearly established" standard in light of the specific circumstances confronting the officials who acted. If, at the time of their action, the law was not clearly established, the officials could not "fairly be said to 'know' that the law forbade conduct not previously identified as unlawful". *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Thus, even where a constitutional violation is found to have occurred, officials are entitled to immunity if the right was not "clearly established" or if the official reason-

ably could have believed that the specific conduct was lawful. *Altshuler v. Seattle*, 63 Wn. App. 389, 394, 819 P.2d 393 (1991), *review denied*, 118 Wn.2d 1023 (1992).

To find a clearly established right, the court must determine whether the unlawfulness of the conduct was apparent at the time of the officer's action. *Harlow*, 457 U.S. at 818. Under the test announced in *Anderson v. Creighton*, 483 U.S. 635, 639-40, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987):

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640.

As early as 1968, the United States Supreme Court held that the right of public employees to comment on matters of public concern was a clearly established First Amendment right. *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). More specific to this case, reports of patient abuse were clearly established as being matters of public concern in 1979 when the Legislature required nursing home employees to report suspected cases of patient abuse, and imposed a criminal penalty for failing to do so. Laws of 1979, Ex. Sess., ch. 228, § 3; RCW 70.124.030. By reporting the suspected abuse, White was not only conducting herself in a *legally permissible* manner, she was conducting herself in a *legally required* manner. White, therefore, has met her burden of demonstrating that reports of patient abuse were "clearly established" as a matter of public concern when the defendants acted. The qualified immunity defense is not available to shield Harrah and Blanchard from liability.

## C. Wrongful Transfer Claim

White argues that the trial court erred in

dismissing her claim, against both the State and the individual defendants, for wrongful transfer in violation of public policy. An employer can be liable in tort for discharging an at-will employee for a reason that violates public policy. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 233, 685 P.2d 1081 (1984); *Dicomes*, 113 Wn.2d at 617. This public policy exception is a "narrow" one, balancing the interests of both the employer and the employee. *Thompson*, 102 Wn.2d at 232-33. The employer is protected against frivolous lawsuits and can make personnel decisions without fear of incurring civil liability, and the employee is protected against employer actions that contravene a clear public policy. *Thompson*, 102 Wn.2d 219. These previous cases, however, all concerned at-will employees who were terminated from their positions. *See Thompson*, 102 Wn.2d at 223; *Wilmot v. Kaiser Aluminium & Chem. Corp.*, 118 Wn.2d 46, 51-55, 821 P.2d 18 (1991); *see also Guild v. St. Martin's College*, 64 Wn. App. 491, 496, 827 P.2d 286, *review denied*, 119 Wn.2d 1016 (1992) (wrongful discharge tort not applicable to employee terminated upon expiration of yearly renewable employment contract).

White requests that we extend this tort cause of action to include transfers and "for-cause" employees.[5] However, to broaden the exception to include lesser employment actions, such as transfers, would expose employers to an increase in frivolous lawsuits, hinder their ability to make

[5]Research has not disclosed a case in which the court has extended the cause of action. In fact, the Washington Supreme Court appears to have declined to extend the wrongful discharge tort to include lesser employment actions in a recent case, *Bravo v. Dolsen Co.*, 125 Wn.2d 745, 888 P.2d 147 (1995). In *Bravo*, the court held that RCW 49.32.020 confers substantive rights on employees, including the right to form a labor union, and gives rise to a statutory based cause of action. 125 Wn.2d at 753-54. Because the statute prohibits " 'interference, restraint, or coercion' ," the *Bravo* court held that this statutory cause of action encompasses more than discriminatory discharges. 125 Wn.2d at 756 (quoting RCW 49.32.020). Furthermore, because the statute expresses an important public policy of this state, the court held that RCW 49.32.020 also gives rise to a tort cause of action for a wrongful discharge in violation of public policy. 125 Wn.2d at 758. The *Bravo* court, however, did not then extend the wrongful discharge tort to encompass lesser employment actions, restricting the tort to a "a *discharge* which violates RCW 49.32.020 also gives rise to a tort of discharge in violation of a clear mandate of public policy." 125 Wn.2d at 758 (emphasis added).

personnel decisions, and skew the balancing of interests in favor of the employee. *See Thompson*, 102 Wn.2d at 232-33. Furthermore, the courts are ill-equipped to act as super personnel agencies for every employment dispute. *Washington Fed'n of State Employees v. State Personnel Bd.*, 29 Wn. App. 818, 820, 630 P.2d 951 (1981). These considerations, therefore, weigh against extending the public policy tort to include the wrongful transfer of employees.[6] Accordingly, the trial court's dismissal of White's wrongful transfer cause of action is affirmed.

Finally, because we hold that White does not possess a tort cause of action for a wrongful transfer in violation of public policy, we need not address issues that White raises concerning the state tort claims statute, RCW 4.92.110.

Affirmed in part, reversed in part and remanded for further proceedings.

HOUGHTON, A.C.J., and BRIDGEWATER, J., concur.

After modification, further reconsideration denied August 25, 1995.

Review granted at 128 Wn.2d 1024 (1996).

---

[6]This case does not involve a constructive discharge, i.e., deliberately making an employee's working conditions intolerable thereby forcing the employee to resign. *Binkley*, 114 Wn.2d at 388. White is not alleging that she was exposed to conditions that forced her to resign. Instead, White challenges the actual transfer as punitive.