
**Filed**
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## MARK C. CHARFAUROS,
Petitioner-Appellant,

**v.**

## CIVIL SERVICE COMMISSION,
Respondent-Appellee,

### and

## GUAM POLICE DEPARTMENT
Real Party in Interest-Appellee.

Supreme Court Case No. CVA21-007
Superior Court Case No. SP0126-19

## OPINION

### Cite as: 2022 Guam 19

Appeal from the Superior Court of Guam
Argued and submitted on March 22, 2022
Via Zoom video conference

**E-Received**
12/30/2022 2:25:24 PM

Appearing for Petitioner-Appellant:
F. Randall Cunliffe, *Esq.*
Cunliffe & Cook, P.C.
A Professional Corporation
210 Archbishop Flores St., Ste. 200
Hagåtña, GU 96910

Appearing for Respondent-Appellee:
Eric D. Miller, *Esq.*
Civil Service Commission
Bell Tower
710 W. Marine Corps Dr., Ste. 201
Hagåtña, GU 96910

Appearing for Real Party in Interest-Appellee:
Marianne Woloschuk, *Esq.*
Assistant Attorney General
Office of the Attorney General
Litigation Division
590 S. Marine Corps Dr.
Tamuning, GU 96913

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**MARAMAN, J.:**

Petitioner-Appellant Mark C. Charfauros appeals from the Superior Court's judgment affirming a decision by the Civil Service Commission, which upheld the Guam Police Department's termination of Charfauros's employment for insubordination and other misconduct. Charfauros argues his termination was unlawful because it violated his First Amendment right to free speech; in the alternative, he asks the court to find the sanction of termination unduly "harsh" and to remand to the Civil Service Commission for a lesser employment sanction. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following recitation of facts primarily stems from the Civil Service Commission ("CSC") record submitted to the Superior Court, including the transcript of Charfauros's adverse action hearing.

### A. The Agat Incident and First Administrative Investigation

Before his termination, Charfauros was employed by the Guam Police Department ("GPD"). At GPD, Charfauros held the titles of "Colonel" and "Police Commander," meaning he held the "highest classified uniform rank" in the department and was subordinate only to the Chief of Police.

Charfauros was involved in an incident in the village of Agat ("Agat incident"). While GPD officers were investigating a report of an illegal fireworks display, Charfauros appeared at the scene of the investigation and initiated a heated communication with the officers there. Some of the communication between Charfauros and the officers was captured on an officer's

bodycam. In the view of then-Chief of Police Joseph I. Cruz ("Chief Cruz"), it was "fair" to characterize the bodycam footage as showing Charfauros "screaming and using obscenities at the police officers," Record on Appeal ("RA"), tab 29 (Subm. Certif. R., Oct. 8, 2020), Tr. at 24 (CSC Bd. Comm'rs Mtg. ("Adverse Action Hr'g"), Mar. 19, 2019), and acting "very unprofessional and demeaning to the officers who were there." *Id.* at 25.

Chief Cruz met with Charfauros to discuss the Agat incident. Chief Cruz felt Charfauros's conduct in Agat "was not consistent with rules in place for how a senior officer handles a potential crime scene." RA, tab 24 (Subm. Certif. R., July 29, 2020), CSC Dec. & Order at 3 (May 9, 2019). Chief Cruz informed Charfauros there would be an administrative investigation into the Agat incident, and he placed Charfauros on administrative leave. Charfauros's gun and badge were taken from him the morning of December 27, 2016, and the document placing him on administrative leave was completed around 4:00 p.m. the same day.

**B. Media Interviews and Second Administrative Investigation**

After the Agat incident but before Charfauros's meeting with Chief Cruz, the bodycam footage of Charfauros appeared in the local news and on social media. The record does not explain how or why this occurred. The parties agree the bodycam footage was widely viewed and discussed in the press and on social media.

During his meeting with Chief Cruz, Charfauros expressed concern that people "were getting only one side of the story," and he told Chief Cruz he wanted to speak to the media to explain his side of the story about the Agat incident. RA, tab 29 (Subm. Certif. R., Oct. 8, 2020), Tr. at 59-60 (Adverse Action Hr'g, Mar. 19, 2019). Chief Cruz orally advised Charfauros against this course of action. He informed Charfauros that, while he couldn't stop Charfauros from speaking, if Charfauros chose to do so in contravention of Chief Cruz's advice, what came

next would be "on him." *Id.* at 40. Chief Cruz then told Charfauros he planned to consult the director of the Department of Administration to ensure that Cruz would not be violating any rules or regulations in permitting Charfauros to speak to the media. In Charfauros's words, Chief Cruz told him that "if he does not call my [sic] by 5:00, then that means I'm okay, I can go . . . I can speak to the media." *Id.* at 74. Chief Cruz's testimony, however, is that there was an understanding that there was not to be any such communication until the investigation was complete.

Chief Cruz testified that he did not follow up with Charfauros in person or by phone call, but issued Charfauros a memorandum which, among other things, advised him not to speak about the matter while the investigation was pending. *Id.* at 41-42; *see also* RA, tab 24 (Subm. Certif. R., July 29, 2020), Mgmt.'s Ex. M20 (Admin. Leave Mem., Dec. 27, 2016) ("You are hereby further advised to refrain from making comments and remarks outside of the case investigation, until the investigation is completed."). Charfauros acknowledged receipt of this memorandum but stated he only "skimmed through" it because it was "the same form that they give every employee." RA, tab 29 (Subm. Certif. R., Oct. 8, 2020), Tr. at 73 (Adverse Action Hr'g, Mar. 19, 2019).

Over the next few days, notwithstanding Chief Cruz's memo and advice, Charfauros spoke to at least three media outlets about the Agat incident.[1] In an interview with the Buzz Radio Talk Show on December 28, 2016, Charfauros suggested GPD had conducted illegal searches in Agat, claiming the officers lacked probable cause and did not receive permission

---

[1] At his adverse action hearing, Charfauros could not recall which days he gave interviews or how many total interviews he gave. The Superior Court recognized Charfauros spoke to, at minimum: (1) Jesse Lujan, the Buzz Radio Talk Show, KUAM on December 28, 2016; (2) the Patti Arroyo Radio Talk Show, K-57 on December 29, 2016; and (3) Janela Carrera, Pacific News Center on December 28, 2016. The Final Notice of Adverse Action prepared by GPD also refers to these three interviews. The audio and video recordings of these interviews were part of the CSC record submitted to the Superior Court. *See* Record on Appeal ("RA"), tab 24 (Subm. Certif. R., July 29, 2020), Mgmt.'s Ex. M136 (CD – Media Audio & Video).

from homeowners to search their properties. *See generally* RA, tab 24 (Subm. Certif. R., July 29, 2020), Mgmt.'s Ex. M136 at 11:50-19:45 (CD – Media Audio & Video). Charfauros stated that he made no order to the officers there to cease their investigation, but only to ensure they were respecting the constitutional rights of the local citizens. *Id.* at 27:30-29:00. Other portions of Charfauros's interview with the Buzz Radio Talk Show addressed more personal topics, i.e., his own conduct and appearance in the bodycam footage. Charfauros explained the bodycam footage showed him yelling and slurring his words because he was suffering from a medical ailment, not because he was intoxicated. *Id.* at 25:30-27:30. He also repudiated a rumor he had intervened in the investigation because the party being investigated happened at one of his relatives' homes, asking how it could be that he was protecting family members when the officers had no suspect. *Id.*

After learning Charfauros had conducted media interviews contrary to the memorandum that advised he not make comments, Chief Cruz initiated a second administrative investigation into Charfauros. When the second administrative investigation concluded, Charfauros was served with a Final Notice of Adverse Action ("FNAA"). The FNAA first listed several factual findings, including GPD's conclusion that the other officers had probable cause to conduct their search in the Agat incident. The FNAA then alleged Charfauros's act of conducting media interviews against Chief Cruz's advisement had violated several GPD policies, e.g., "fail[ing] to keep secret confidential information regarding an ongoing investigation after being directly ordered by the Chief of Police to refrain from discussing any information related to the case," "violat[ing] department policy which states that no employee shall make public statements without the express authorization of the Chief of Police," and "[bringing] disrepute and discredit to yourself and the Guam Police Department [by making] false statements to the media alleging

that police officers had conducted illegal residential searches." RA, tab 24 (Subm. Certif. R., July 29, 2020), Mgmt.'s Ex. M29-M32 (Final Notice Adverse Action at 8-11, Feb. 16, 2017). The FNAA found Charfauros had committed "[i]nsubordination" and several other violations of the department's rules and regulations, and thus terminated his employment. *Id.* at Ex. M28-M37 (Final Notice Adverse Action at 7-16).

## C. Post-Termination Proceedings

Charfauros appealed the FNAA to the CSC. The CSC held a hearing and received testimony from Chief Cruz and Charfauros. After the hearing, the CSC voted to sustain Charfauros's termination. The CSC found clear and convincing evidence to support GPD's finding of insubordination.

Charfauros raised a First Amendment defense before the CSC, but the CSC rejected the argument. The CSC noted, "[N]ot once during his testimony did [Charfauros] state that it was his goal to report wrongful acts to the public. Rather, he testified that he needed to get out his side of the story and wished to clear the record." RA, tab 24 (Subm. Certif. R., July 29, 2020), CSC Dec. & Order at 6 (May 9, 2019). Thus, upon finding Charfauros "acted out of his own self-interest and not out of any desire to advise the media of a matter of public concern," the Civil Service Commission held Charfauros's speech was not protected by the First Amendment. *Id.* at 6-7.

Charfauros then sought judicial review in the Superior Court, reasserting his First Amendment claim. To analyze the claim, the Superior Court applied a three-part test deriving from United States Supreme Court precedent articulated in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny. The Superior Court first held that Charfauros spoke to the media as a private citizen, not as a representative of GPD, which allowed for possible First

Amendment protection. The Superior Court further held, however, that Charfauros's speech addressed a matter of personal concern rather than a matter of public concern, which denied First Amendment protection. The Superior Court alternatively held that even if Charfauros's speech *had* addressed a matter of public concern, Charfauros's personal interest in speaking to the media did not outweigh GPD's interest in maintaining effective operations, which also denied First Amendment protection to his speech.

On September 15, 2021, Charfauros and GPD executed a Stipulated Judgment which provided the following:

> On July 6, 2021, the court issued a decision and order affirming the decision and judgment of the Civil Service Commission, which sustained real party in interest Guam Police Department's (GPD) adverse action on the termination against petitioner Mark C. Charfauros in Adverse Action appeal Case No. 17-AA03T. The court's decision and order was entered on the docket on July 13, 2021.
>
> IT IS HEREBY ORDERED, ADJUDGED AND DECREED by this court that the decision and judgment of the Civil Service Commission is affirmed. Judgment shall be entered in favor of real party in interest GPD and against petitioner Charfauros.

RA, tab 42 (Stipulated Judgment, Sept. 15, 2021). Charfauros timely appealed.

## II. JURISDICTION

Decisions of the Civil Service Commission are subject to judicial review. *Guam Police Dep't v. Guam Civ. Serv. Comm'n (Charfauros)*, 2020 Guam 12 ¶ 6 (citing 4 GCA § 4406(d) (as amended by Guam Pub. L. 30-112:3 (Mar. 12, 2010))); *Carlson v. Perez*, 2007 Guam 6 ¶ 65. "The vehicle for obtaining this review is a petition for judicial review filed in the Superior Court of Guam." *Charfauros*, 2020 Guam 12 ¶ 6 (citing *Carlson*, 2007 Guam 6 ¶ 65; 7 GCA § 7117 (2005)). We have jurisdiction over appeals from final orders of the Superior Court. 48 U.S.C.A.

§ 1424-1(a)(2) (Westlaw through Pub. L. 117-248 (2022)); 7 GCA §§ 3107, 3108(a), 25102(a) (2005).[2]

## III. STANDARD OF REVIEW

"We examine whether the trial court properly determined that the CSC's decision was in accordance with the law and supported by substantial evidence." *Guam Waterworks Auth. v. Civ. Serv. Comm'n (Mesngon)*, 2014 Guam 35 ¶ 5. "In so doing, we will review all conclusions of law *de novo*, and will hold unlawful and set aside any agency action, findings and conclusions found to be irrational, or otherwise not in accordance with law or unsupported by substantial evidence in a case." *Fagan v. Dell'Isola*, 2006 Guam 11 ¶ 13; *see also Port Transp., Stevedore & Terminal Emps. v. Guam Civ. Serv. Comm'n (Port Auth. of Guam)*, 2018 Guam 18 ¶ 5; *Santos v. Guam Civ. Serv. Comm'n (Dep't of Corr.)*, 2019 Guam 22 ¶ 8.

We review the CSC's findings of fact under the "substantial evidence" standard. *See Santos*, 2019 Guam 22 ¶ 8. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Port Transp.*, 2018 Guam 18 ¶ 6 (quoting *Fagan*, 2006 Guam 11 ¶ 12). "Substantial evidence is more than a mere scintilla, but less than a preponderance." *Guam Mem'l Hosp. Auth. v. Civ. Serv. Comm'n (Chaco)*, 2015 Guam 18 ¶ 15 (quoting *NLRB v. Int'l Bhd. of Elec. Workers, Local 48*, 345 F.3d 1049, 1053-54

---

[2] This court generally does *not* have jurisdiction over a stipulated judgment in a civil case. *See B.M. Co. v. Avery*, 2001 Guam 27 ¶ 45 ("[U]nlike judgments after trial, consent or stipulated judgments are generally not appealable."); *accord Flannery v. Prentice*, 28 P.3d 860, 872 (Cal. 2001) ("A judgment rendered with consent of the appellant is not appealable." (citation omitted)). However, the California Supreme Court has recognized:

> [T]he rule has expressly been "limited to cases wherein it does not appear from the record that the consent was given only *pro forma* to facilitate an appeal, and with the understanding on both sides that the party did not thereby intend to abandon his right to be heard on the appeal in opposition to the judgment or order."

*Norgart v. Upjohn Co.*, 981 P.2d 79, 91 (Cal. 1999) (quoting *Mecham v. McKay*, 37 Cal. 154, 159 (1869)). This is precisely the circumstance here. The stipulated judgment here is merely an agreement by the parties that the July 6, 2021 Decision and Order was the Superior Court's final adjudication of the matter, not a substantive stipulation to the tenets of the decision itself. The stipulation is thus merely an effort by the parties to expedite the process of receiving an appealable final order, and we do not lack jurisdiction over a stipulated judgment of this nature.

(9th Cir. 2003)). "The substantial evidence standard is 'extremely deferential'—accordingly, the court should not do its own weighing of the evidence, nor should it substitute its factual determinations for the agency." *Port Auth. of Guam v. Civ. Serv. Comm'n (Castro)*, 2021 Guam 4 ¶ 14 (quoting *Chaco*, 2015 Guam 18 ¶ 16).

## IV. ANALYSIS

### A. Charfauros's Termination Did Not Violate the First Amendment

The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. These principles apply in Guam through the Organic Act of Guam. *See* 48 U.S.C.A. § 1421b(a) ("No law shall be enacted in Guam . . . abridging the freedom of speech . . . ."); *Guam v. Guerrero*, 290 F.3d 1210, 1214 (9th Cir. 2002) (noting that § 1421b(a) is "virtually identical to its federal counterpart"). Where the Organic Act uses "substantively identical language," this court "lacks the authority to interpret a federal statute or federal constitutional provision contrary to the interpretation the U.S. Supreme Court has given it." *People v. Moses*, 2016 Guam 17 ¶¶ 20-21 (quoting *Guerrero*, 290 F.3d at 1217-18). Axiomatically, however, neither the First Amendment nor § 1421b(a) protect all speech activities in all circumstances. Our task is to determine whether Charfauros's speech was protected, and thus whether his termination was unlawful.

The Guam Police Department is an agency within the executive branch of the Government of Guam, *see* 10 GCA § 77102(a) (2005), which means Charfauros was a government employee when he spoke to the media. Government employees have some First Amendment rights; they do not "relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam). But "[w]hen a citizen enters government service, the citizen by necessity

must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Thus, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Roe*, 543 U.S. at 80. Employees of law enforcement agencies, in particular, "are subject to greater First Amendment restraints than most other citizens." *McMullen v. Carson*, 754 F.2d 936, 938 (11th Cir. 1985) (citing *Kelley v. Johnson*, 425 U.S. 238 (1978)).

The extent of First Amendment protection afforded to a government employee ultimately depends on balancing the interests of the government employee as a speaker and of the government itself as an employer. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418-19. Government employees "occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Id.* at 419. As the U.S. Supreme Court has explained:

> [T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. . . .
>
> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters v. Churchill*, 511 U.S. 661, 674-75 (1994).

The Superior Court analyzed Charfauros's First Amendment claim under the *Pickering* framework. *See* RA, tab 36 at 4 (Dec. & Order, July 6, 2021). What standard applies in a First Amendment case is a question of law. We adopt the *Pickering* framework in weighing a government employee's speech interest against the interests of his employer. The three relevant considerations in this case are: (1) whether the employee spoke in his capacity as a "private citizen" or as a "public employee"; (2) whether the employee spoke on a matter of "public concern" or a matter of "private concern"; and (3) whether the government's interest in "promoting the efficiency of the public services it performs through its employees" outweighs the employee's interest in "commenting upon matters of public concern." *See Pickering*, 391 U.S. at 568.[3] We analyze each.

### 1. Charfauros spoke in his capacity as a "private citizen"

A government employee first bears the burden of showing he spoke "in the capacity of a private citizen and not a public employee." *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009). The First Amendment does not protect speech made by a government employee as part of the performance of their official duties. *See id.*; *Garcetti*, 547 U.S. at 421. A government employee speaks as a private citizen "if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid

---

[3] In federal courts of appeal, the *Pickering* test is generally refined into a five-step inquiry as to whether the government was justified in treating an employee differently from other members of the general public. 16B C.J.S. *Constitutional Law* § 1062. GPD's brief argues under such a five-part test, with reference to *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009). Appellee's Br. at 20 (Dec. 27, 2021). That test, in effect, measures the same three factors that Charfauros's brief acknowledges along with two other prongs: "whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action" and "whether the state would have taken the adverse employment action even absent the protected speech." *Eng*, 552 F.3d at 1070. But these factors are not at issue in this appeal. Neither party claims Charfauros's termination was based on anything but his speech activities. Thus, Charfauros's speech was clearly a "substantial or motivating factor" in his termination, and nothing suggests GPD would have terminated his employment absent his speech activities. We therefore limit our analysis to the three factors common to both *Eng* and the Superior Court's approach.

to perform.'" *Eng*, 552 F.3d at 1071 (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)).

"While 'the question of the scope and content of a plaintiff's job responsibilities is a question of fact,' the 'ultimate constitutional significance of the facts as found' is a question of law." *Id.* (quoting *Posey*, 546 F.3d at 1129-30). The Superior Court held that Charfauros spoke in his capacity as a private citizen, recognizing Charfauros had surrendered his gun and badge and had been placed on administrative leave at the time of his interviews. We agree: these factors support finding Charfauros was not speaking in his official capacity. Since Charfauros was on administrative leave at the time of his media interviews and did not have Chief Cruz's permission to speak to the media, he was not speaking at the behest of GPD. And while GPD suggests Charfauros's normal job duties as a colonel and police commander sometimes include acting as a departmental spokesperson, Appellee's Br. at 21 (Dec. 27, 2021), Charfauros was not detailed to a spokesperson role for *this* speech. *Cf. Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022) (finding plaintiff spoke in his capacity as a private citizen because he "did not speak pursuant to government policy" and "was not seeking to convey a government-created message"). Since Charfauros was explicitly prohibited from giving these media interviews, he cannot have been acting pursuant to his official duty when he gave them. We thus agree Charfauros spoke in his capacity as a private citizen, not as a public employee.

### 2. Charfauros spoke on a matter of "public concern"

A government employee also bears the burden of showing his speech activities addressed issues of "public concern" rather than personal concern. *Eng*, 552 F.3d at 1070 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). The First Amendment does not protect an employee from discipline if their speech addresses only issues of personal concern. *See Connick*, 461 U.S. at

146 ("[I]f [employee's speech] cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge."). Whether an employee's speech addressed issues of public concern is "purely a question of law, which we review de novo." *Eng*, 552 F.3d at 1070.

The meaning and extent of "public concern" is not susceptible to precise definition, leading courts to apply a holistic, "generalized analysis of the nature of the speech" in question. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009). Courts examine the "content, form, and context of a given statement, as revealed by the whole record" to determine whether a government employee's speech addresses a public concern. *Connick*, 461 U.S. at 147-48. But "content is the greatest single factor in the *Connick* inquiry." *Berg v. Hunter*, 854 F.2d 238, 243 (7th Cir. 1988); *accord Mitchell v. Hillsborough County*, 468 F.3d 1276, 1284 (11th Cir. 2006). And "[w]here speech relates to a matter of inherent public concern, such as official malfeasance or the neglect of duties," the public concern inquiry is "confined to the subject matter of the speech." *Decotiis v. Whittemore*, 635 F.3d 22, 30 (1st Cir. 2011).

Charfauros characterizes his media interviews as an effort to discuss misconduct, including possible violations of the constitutional rights of citizens, by GPD officers during the Agat incident. *See* Appellant's Br. at 12-14 (Nov. 10, 2021). We agree with Charfauros that *some* portions of his interviews addressed this subject, and we join with several other courts in recognizing police misconduct as a quintessential matter of public concern. *See, e.g.*, *Gorman v. Rensselaer County*, 910 F.3d 40, 46 (2d Cir. 2018); *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001); *Martinez v. Hooper*, 148 F.3d 856, 859 (7th Cir. 1998); *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013).

In response, GPD asserts that Charfauros testified before the CSC that "his main motivation for going on air was to clear his name and tell his side of the story." Appellee's Br. at 22. Perhaps—but an employee's motivation for speaking is not dispositive as to whether the speech *itself* implicates a public concern. *See, e.g.*, *Kristofek v. Village of Orland Hills*, 712 F.3d 979, 985 (7th Cir. 2013) ("[M]otive alone does not conclusively determine whether a public employee's speech involves a matter of public concern."); *Belk v. City of Eldon*, 228 F.3d 872, 880 (8th Cir. 2000) (holding that the presence of "unsavory personal motives" does not "eviscerate" constitutional protection, "so long as the speech itself addresses matters of public concern"); *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1105 (9th Cir. 2011) (concluding that if speech meets the public concern test, it is protected "irrespective of the motivation behind the speech in question"). Thus, an employee's speech may still receive constitutional protection even if the speaker were "motivated *exclusively* by his own self-interest." *Kristofek*, 712 F.3d at 985. Even assuming Charfauros spoke primarily to benefit his personal reputation in the community, this "unsavory" motivation would not deny First Amendment protection to speech on a matter of genuine public concern.

But other portions of Charfauros's interviews—those addressing community rumors about his conduct in Agat—do not implicate a public concern. Broadly speaking, speech addresses a public concern when it discusses "'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940)). Speech does not address a public concern if it has "no relevance to the public's evaluation of the performance of governmental agencies." *Id.* Speech does not address a public concern just because it interests the public—the speech must

also meaningfully contribute to public discourse regarding government operations. *See Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (per curiam).

The portions of Charfauros's speech intended to rebut community rumors about himself offered "no relevance to the public's evaluation" of GPD as an agency. *Cf. McKinley*, 705 F.2d at 1114. These topics may have had personal salience to Charfauros, but they are not useful to the public in assessing police performance. And while Charfauros suggests these topics were inherently a matter of public concern because they were discussed "all over social media," Appellant's Br. at 9, the public concern requirement is not satisfied merely by assessing the public's level of interest in a topic. *See Morgan*, 6 F.3d at 754. Instead, communication that is "essentially self-interested, with no public import," like Charfauros's rebuttal of community rumors, does not implicate a public concern. *Roe v. City & County of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997).

Because Charfauros's interviews address both a matter of public concern (police misconduct) and a matter of private concern (community rumors), his media interviews can be described as "mixed speech." *See, e.g.*, *Farhat v. Jopke*, 370 F.3d 580, 590 (6th Cir. 2004); *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 826 (5th Cir. 2007) ("[E]ven a mere scintilla of speech regarding a matter of public concern is sufficient to treat the entire communication as mixed speech."). Mixed speech satisfies the public concern requirement where the government employee "was not speaking exclusively or predominantly in pursuit of her own interests." *Schilcher v. Univ. of Ark.*, 387 F.3d 959, 965 (8th Cir. 2004); *see also Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 894 (6th Cir. 2003) ("[T]he entirety of the employee's speech does not have to address matters of public concern, so long as some portion of the speech touches on a matter of public concern."). This standard is met here. Charfauros's media

interviews devoted significant time and effort to police misconduct, which is indisputably a legitimate issue of public concern. While the interviews also addressed private concerns, we cannot say these private concerns were "exclusively or predominantly" the subject of his speech. Charfauros's speech, though "mixed" in nature, sufficiently discussed a "public concern" to allow the analysis to continue.

### 3. GPD's interests outweigh Charfauros's interests in speaking

Because Charfauros spoke in his *private* capacity on a matter of *public* concern, we must balance the interests of Charfauros, as a citizen, with those of GPD, as Charfauros's employer. *See Pickering*, 391 U.S. at 568 (explaining need for balancing of these respective interests). "Resolution of the *Pickering* balance is a question of law dependent on underlying factual findings." *Germann v. City of Kansas City*, 776 F.2d 761, 764 (8th Cir. 1985); *see also Breuer v. Hart*, 909 F.2d 1035, 1037 (7th Cir. 1990). The government bears the burden of demonstrating that this weighing is in its favor. *See Hernandez v. City of Phoenix*, 43 F.4th 966, 979 (9th Cir. 2022); *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 906 (9th Cir. 2021). Courts have "applied a sliding scale in which the 'state's burden in justifying a particular discharge [or adverse employment action] varies depending upon the nature of the employee's expression.'" *Moser*, 984 F.3d at 906 (alteration in original) (quoting *Connick*, 461 U.S. at 150). For this balancing, Charfauros's interests include his "interests in communicating, and the interests of the community in receiving, information 'on matters of public importance,'" while GPD's interests include "preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *O'Connor v. Steeves*, 994 F.2d 905, 915 (1st Cir. 1993) (quoting *Pickering*, 391 U.S. at 573).

In *Connick v. Myers*, the U.S. Supreme Court expanded on the government employer's interest in "effective and efficient fulfillment of its responsibilities to the public."  461 U.S. at 150.  The *Connick* court suggested deference to the government's employment decisions may be warranted, reasoning:

> "[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.  This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.  Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

461 U.S. at 151 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974) (Powell, J., concurring)). Thus, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment [in imposing employment sanctions] is appropriate."  *Id.* at 151-52; *see also Garcetti*, 547 U.S. at 422 (noting "the emphasis of our precedents on affording government employers sufficient discretion to manage their operations").

The CSC found several facts weighing in favor of GPD for *Pickering* balancing, including GPD's interest in maintaining a "fair and unbiased investigation" into the Agat incident without external distractions; the inherent time limitation on the advisement against speaking to the media;[4] the "paramilitary" nature of GPD's hierarchy of command and respect for orders given by superior officers; and possible erosion of departmental cohesion if high ranking officers could violate internal rules without consequence.  RA, tab 24 (Subm. Certif. R.,

---

[4] Charfauros was initially advised to refrain from communicating with the media until the end of the investigation.  And as GPD notes, under the then-operative version of 4 GCA § 4406, GPD was limited to 60 days to complete its investigation and take action, if warranted.  *See* Appellee's Br. at 23-24.  Because the investigation could last no more than 60 days, the advisement against speaking to the media was also limited by law to no more than 60 days.

July 29, 2020), CSC Dec. & Order at 7 (May 9, 2019). We find no indication that these findings are "irrational," "otherwise not in accordance with law, or unsupported by substantial evidence." *Fagan*, 2006 Guam 11 ¶ 13. The CSC determined that these findings each weigh in GPD's favor, and that GPD has a significant, and reasonable, interest in restricting public comments on pending investigations. The Superior Court found that Charfauros's interest in speaking did not outweigh GPD's interest to conduct an administrative investigation. RA, tab 36 at 8 (Dec. & Order, July 6, 2021). This is a question of law we review *de novo*. *Mesngon*, 2014 Guam 35 ¶ 5.

Charfauros argues there was no testimony before the CSC showing his media interviews affected GPD's operations. Appellant's Br. at 14-15. But for purposes of *Pickering* balancing, the government employer "need show only a '*likely* interference' with its operations, and 'not an *actual* disruption.'" *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999) (quoting *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995)). Thus, a government employer is not required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152.

Charfauros's media interviews were likely to disrupt GPD operations given the context in which he gave those interviews. It is significant, for *Pickering* balancing, that Charfauros not only spoke publicly about a confidential matter, but also violated a direct advisement from the Chief of Police. This can be fairly characterized as insubordination, a valid consideration in assessing the interests of the government employer. *See Barnard v. Jackson County*, 43 F.3d 1218, 1224 (8th Cir. 1995) ("Employee acts of insubordination may tip the balancing process in favor of the employer's interests in the efficient promotion of its services."); *see also Elrod v. Burns*, 427 U.S. 347, 366 (1976) ("[E]mployees may always be discharged for good cause, such as insubordination or poor job performance, when those bases in fact exist.").

It is also significant that Charfauros was not merely a "rank and file" police officer, but the highest ranked classified uniformed officer in GPD. "[E]mployees who hold high-level positions are 'unlikely' to prevail under the *Pickering* balancing test when they have engaged in speech that is critical of their employer. In 'most cases' of this type, the likelihood of disruption will outweigh the employees' right to speak." *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 279 (2d Cir. 1999) (quoting *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997)).

Charfauros's testimony indicates his duties as a colonel include being "involved in highly technical police administrative duties and investigations. . . . Stuff that's confidential and is also upper management." RA, tab 29 (Subm. Certif. R., Oct. 8, 2020), Tr. at 57 (Adverse Action Hr'g, Mar. 19, 2019). Given Charfauros's management-level position within GPD and direct subordinate relationship to Chief Cruz, it is reasonable to infer Charfauros's act of insubordination would have interfered with his future work relationship with Chief Cruz. *Cf. Simard v. Bd. of Educ.*, 473 F.2d 988, 996 (2d Cir. 1973) (concluding that "no evidence on the record is needed to prove th[e] truism" that insubordination can affect working relationships (internal quotation marks omitted)). It is also reasonable to infer Charfauros's explicit violation of a direct advisement from the Chief of Police could set a problematic precedent for other, lower-ranked officers confronted with an advisement or order they may not agree with. *See Domiano v. Village of River Grove*, 904 F.2d 1142, 1146 (7th Cir. 1990) (noting discharged fire chief failed to rebut "the reasonable inference that a fire chief's refusal to follow an ordinance regulating the fire department would arouse an insurrectionary and divisive spirit among department members").

Charfauros does have legitimate interest in calling the public's attention to possible police misconduct. In the interviews, he claimed that the officers conducting the search in Agat lacked probable cause and had not received permission from the homeowners to search their property. RA, tab 24 (Subm. Certif. R., July 29, 2020), Mgmt.'s Ex. M136 at 13:30-19:45 (CD – Media Audio & Video). He also defended his behavior at the scene, saying that his actions were intended to protect the constitutional rights of the local citizens. *Id.* at 27:30-29:00. These are matters of inherent public concern.

Nevertheless, in weighing the parties' interests, the context in which the dispute arose is significant. *Connick*, 461 U.S. at 153. Charfauros himself explained that he primarily intended to clear his name and tell his side of the story. Appellee's Br. at 22. The nature of this speech, therefore, being motivated by self-interest and personal grievance, somewhat lessens GPD's burden in justifying its ultimate discharge of Charfauros. *See Hicks v. City of Watonga*, 942 F.2d 737, 745 (10th Cir. 1991).

Given Charfauros's high-level role in GPD and his subordination only to Chief Cruz, we conclude Chief Cruz and Charfauros had the "kind of close working relationship[] for which it can be persuasively claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering*, 391 U.S. at 570. "High-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims . . . ." *Hall v. Ford*, 856 F.2d 255, 263 (D.C. Cir. 1988). Furthermore, Charfauros was not permanently prohibited from speaking but limited only for the duration of GPD's internal investigation. As such, even considering the legitimate interests Charfauros had in speaking, we find that GPD has

demonstrated that the *Pickering* balancing test ultimately weighs in its favor. Thus, the First Amendment did not prohibit GPD from terminating Charfauros's employment.

**B. We Will Not Direct the Civil Service Commission to Impose a Lesser Sanction**

Charfauros also asks this court to find the sanction of termination was "much more harsh than the violation" for which it was imposed; he thus asks the court to remand the matter to the CSC with the direction to impose an "alternative sanction." Appellant's Br. at 20-21. We need not decide whether the sanction was "harsh" because even if it were so, that is no basis for us to impose upon the CSC's decision-making process.

The judiciary's role in reviewing the CSC is limited to determining whether "the agency decision is not in accordance with law or not supported by substantial evidence." *Port Transp.*, 2018 Guam 18 ¶ 5 (quoting 5 GCA § 9240 (2005)). Neither circumstance is present here. First, under the Department of Administration's Personnel Rules and Regulations, an agency may impose the sanction of termination upon a finding of insubordination, even if it is the employee's first offense. *See* DOA Pers. R. & Regs. 11.402 (Conduct B). Thus, GPD was within its power to impose the sanction, and the CSC did not make an error of law in upholding GPD's decision. Whether or not termination was a subjectively "harsh" sanction under the circumstances, GPD was not precluded by law from imposing it.

Likewise, the factual findings of the CSC were supported by substantial evidence. Despite the fact that when the CSC hears an adverse action appeal, it must make its findings by "clear and convincing" evidence, 4 GCA § 4407(a) (2005), our review is merely for "substantial evidence," *see, e.g.*, *Chaco*, 2015 Guam 18 ¶ 15. Under this comparatively deferential standard, the CSC's decision must stand if the evidence is such that "a reasonable mind might accept [it] as adequate to support a conclusion." *Id.* (quoting *Int'l Bhd. of Elec. Workers*, 345 F.3d at 1054).

Charfauros appears to directly contest only one factual finding: that he "knew that the directive he received was an order from Chief Cruz." RA, tab 24 (Subm. Certif. R., July 29, 2020), CSC Dec. & Order at 5 (May 9, 2019). Charfauros argues the "language of the form is advice, not an order." Appellant's Br. at 20. But this argument merely reargues a question of fact already found by the CSC. The substantial evidence standard does not permit us to reweigh the evidence or to substitute our judgment on a question of fact. *Castro*, 2021 Guam 4 ¶ 14. Our role is instead limited to confirming there was substantial evidence to support the finding the CSC made. Here, such evidence was presented. Chief Cruz's testimony established that within GPD, advisements of this nature are considered orders, and that Charfauros would have understood this given the structure of the GPD chain of command. *See* RA, tab 29 (Subm. Certif. R., Oct. 8, 2020), Tr. at 42-43 (Adverse Action Hr'g, Mar. 19, 2019). Charfauros himself testified he knew administrative investigations were confidential, *id.* at 61-62, and admitted he could not do an interview without clearance from Chief Cruz, *id.* at 66. This testimony, while not overwhelming, is at least substantial evidence showing Chief Cruz's advisement was an order and Charfauros knew this, rendering his decision to conduct media interviews an act of insubordination. The CSC did not err in so finding.

Because the CSC made no legal error upholding the sanction of termination and did not lack substantial evidence for the findings supporting its decision, we have no basis to require the CSC to impose a different sanction. Courts are not empowered to "sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to

be mistaken or unreasonable." *Connick*, 461 U.S. at 146. We will not remand for an alternative sanction.

## V. CONCLUSION

Charfauros's termination did not violate his First Amendment rights. Although Charfauros spoke on a matter of public concern and in his private capacity, his interests in speaking did not outweigh GPD's interests under *Pickering* balancing. We also find no basis to remand to the Civil Service Commission to impose a different disciplinary sanction. We therefore **AFFIRM** the Superior Court.

/s/
ROBERT J. TORRES
Associate Justice

/s/
KATHERINE A. MARAMAN
Associate Justice

/s/
F. PHILIP CARBULLIDO
Chief Justice